## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

WELLS FARGO BANK, N.A., as Successor
Trustee for the Bank of America
Commercial Mortgage Inc. Commercial
Mortgage Pass-Through Certificates, Series
2004-4, by and through its special servicer,
ORIX CAPITAL MARKETS, LLC,
      Plaintiffs,

    v.

BERNARD WASSERMAN, DAVID
WASSERMAN, and RICHARD
WASSERMAN,
      Defendants.

C. A. No. 10-061-M

### MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Judge.

Before the Court are three motions for summary judgment: (1) Plaintiff Wells Fargo Bank's Motion for Summary Judgment (ECF No. 56); (2) Defendants Bernard Wasserman, David Wasserman, and Richard Wasserman's Motion for Summary Judgment (ECF No. 70); and (3) Defendants David Wasserman and Richard Wasserman's Motion for Partial Summary Judgment. (ECF No. 72.) For reasons discussed below, (1) Plaintiff's Motion for Summary Judgment is DENIED; (2) Defendants' Motion for Summary Judgment is DENIED; and (3) Defendants' Motion for Partial Summary Judgment is DENIED.

## I.    FACTS

This dispute arises from a loan made to a Rhode Island limited liability corporation, WREC Precision Park LLC ("WREC"). (ECF No. 56-1 at 1-2.) Defendants, Bernard

Wasserman ("Bernard"), David Wasserman ("David"), and Richard Wasserman ("Richard")[1] (collectively, "the Wassermans"), are each associated with WREC: Bernard is a partial owner of WREC in his individual capacity; David is the majority owner of DDW Precision Park Holdings LLC ("DDW"), with DDW a partial owner of WREC; and Richard is the majority owner of RNW Precision Park Holdings LLC ("RNW"), with RNW another partial owner of WREC. (ECF No. 59-7 at 24.)

In August 2003, WREC and the initial lender, Bank of America, N.A. ("BOA"), entered into a loan agreement for over twenty million dollars ("the Loan") to purchase realty located at 200 Frenchtown Rd., North Kingstown, Rhode Island, known as Precision Park. (ECF No. 56-1 at 2-3.) The Promissory Note, Mortgage, and Loan Agreement (collectively, "the Loan Agreement"), containing the terms and conditions of the Loan, were secured by a mortgage ("the Mortgage") on two lots in North Kingstown, Rhode Island ("the Property"). *Id.* The Property was WREC's only asset. *Id.*

All three Wassermans signed the Loan Agreement. (ECF No. 59-7 at 21.) Bernard signed twice: once, under the heading of "Borrower," as the president of the borrower, WREC, and again under the heading of "Borrower Principal," above his full printed name and the clause as "an Individual." *Id.* David and Richard also signed below the heading "Borrower Principal," above a line with their full printed name and "an Individual." *Id.* Finally, the Loan Agreement included a chart entitled "Organizational Chart – Post-Property Transfer" ("Organizational Chart") laying out the "Borrower Ownership Equity Structure." (ECF No. 59-7 at 23-24.) The Organizational Chart shows six individuals or entities with direct ownership interests in WREC: Bernard; Christopher D. Leahey; Matthew B. Wina; Gerald B. Lavallee; DDW; and RNW. *Id.* at

---

[1] Because all three defendants share a surname, the Court will refer to each defendant by his first name.

24.   To clarify the ownership structure of DDW and RNW, the Organizational Chart adds another level showing David and an irrevocable trust as owners of DDW, and Richard and an irrevocable trust as owners of RNW.  *Id.*  Thus, the Organizational Chart identifies David and Richard's indirect ownership interest in WREC.

On October 1, 2004, the Loan was "'securitized' into a financial product that became a form of equity known as . . . Commercial Mortgage Pass-Through Certificates." (ECF No. 70-1 at 3.)   This transaction involved assignment of the Loan from BOA to Bank of America Commercial Mortgage Inc. Commercial Mortgage Pass Through Certificates, Series 2004-4 ("the Trust"). (ECF No. 76 at 4.) The creation of the Trust was memorialized in the Pooling and Servicing Agreement ("PSA"); the Trust named LaSalle Bank ("LaSalle") as trustee. (ECF No. 76 at 4.) Effective October 12, 2004, BOA also directly assigned its interest in the Loan to LaSalle via an Assignment of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing ("First Assignment"). (ECF No. 60-6.)

The Loan would change hands again effective January 2, 2008, when LaSalle assigned "all of [LaSalle's] right, title and interest, of any kind whatsoever, including that of mortgagee, beneficiary, payee, assignee or secured party . . . in and to the following: Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing" to Plaintiff Wells Fargo Bank ("Wells Fargo") in its "Assignment of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing ("Second Assignment"). (ECF No. 70-3 at 2-3.) Wells Fargo's own "Instrument of Appointment and Acceptance of Successor Trustee"[2] ("Instrument of Appointment") reflected that the Second Assignment "fully vested [Wells Fargo] with all the

---

[2] The Instrument of Appointment is governed by New York law. (ECF No. 60-8 at 3.)

rights, powers, duties, and obligations of the Trustee under the [PSA], with like effect as if originally named therein." (ECF No. 76 at 4.)

In December 2007, WREC defaulted on the Loan, as the December 2007 payment was not made until February 2008. (ECF No. 56-1 at 6.) Again in August 2008, WREC failed to make its payment and thereafter did not make any further payments on the Loan. *Id.* Because of the default, the Loan was transferred to a special servicer, Midland Loan Services ("Midland"); ORIX Capital Markets ("ORIX") later replaced Midland. *Id.*

In early 2009, WREC entered permanent receivership,[3] and in December of that year the appointed receiver sold the Property at a receivership sale. *Id.* at 6-7. Wells Fargo successfully bid on the Property for a credit bid of ten million dollars; Wells Fargo's special servicer, ORIX, now owns the property through its own entity, Precision Park Rhode Island LLC. *Id.* at 7.

By October 2011, according to Wells Fargo, the current deficiency on the Loan was over twenty million dollars, "[including] a credit for the [ten million dollar] credit bid at the receivership sale." *Id.*

## II.    PROCEDURAL HISTORY

Wells Fargo filed suit against the three Wassermans in their individual capacities in early 2010, arguing that WREC's default triggered full recourse liability[4] such that all three Wassermans were personally liable for the full amount of the Loan. (ECF No. 1.)

---

[3]  Under the Rhode Island statutes governing receivership, "Section 7-1.2-1314 unequivocally permits the Superior Court to supervise the liquidation of a corporation in specifically enumerated circumstances. The statute makes no distinction between solvent and insolvent corporations." *Peck v. Jonathan Michael Builders, Inc.*, 940 A.2d 640, 644 (R.I. 2008) (internal citation omitted). The court that oversees liquidation proceedings has considerable discretion to decide whether to appoint a receiver and how the receivership will proceed. *See* R.I. Gen. Laws § 7-1.2-1316 (1956).
[4]  "There are two basic types of secured loans: recourse and non-recourse. The type of loan determines whether the lender may seek remedies against all of the borrower's assets or its

Before the Court today are the three summary judgment motions in this suit: first, Wells

Fargo's Motion for Summary Judgment; second, the Wassermans' Motion for Summary

Judgment; and third, David and Richard's Motion for Partial Summary Judgment as to their

personal liability as individuals for the Loan. (ECF Nos. 56, 70, 72.)  In Part IV, the Court will

address the merits of each motion in turn.[5]

## III.   STANDARD OF REVIEW

Generally, a "court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56.  When reviewing the evidence, the Court "must construe 'the record in

the light most favorable to the nonmovant and resolv[e] all reasonable inferences in that party's

favor' while safely ignoring 'conclusory allegations, improbable inferences, and unsupported

speculation.'"  *Colon-Fontanez v. Municipality of San Juan*, 660 F.3d 17, 27 (1st Cir. 2011)

(quoting *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002)).

Though the Court may construe the evidence in the nonmovant's favor, there is "'no

room for credibility determinations, no room for the measured weighing of conflicting evidence

such as the trial process entails, no room for the judge to superimpose his own ideas of

probability and likelihood (no matter how reasonable those ideas may be)' on the cold pages of

the record." *Rodriguez v. Municipality of San Juan*, 659 F.3d 168, 175 (1st Cir. 2011) (quoting

---

principals' assets (i.e., may hold the borrower or its principals personally liable) (a recourse
arrangement), or only against the asset(s) in which a lender has been granted an interest (i.e., the
lender's redress is limited to the collateral or the assets of the borrower, as applicable)" (a non-
recourse arrangement).  (ECF No. 70-1 at 9.)

[5] The Court will address first the Wassermans' Motion for Summary Judgment. The substantive
issues raised therein are dispositive as to whether Wells Fargo has standing to enforce the
contract and whether the contract itself is enforceable.  In light of the genuine issue of material
fact as to whether the contract is enforceable or illusory, the Court will not address the potential
breaches of the Loan Agreement in this opinion and will restrict its discussion of Defendants'
personal liability for the loan to Defendants' Motion for Partial Summary Judgment.

*Greenburg v. Puerto Rico Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987)). The Court must constrain itself to determining matters of law. *See* Fed. R. Civ. P. 56.

As is the case here, "[t]he happenstance that both parties move simultaneously for *brevis* disposition does not, in and of itself, relax the taut line of inquiry that Rule 56 imposes. 'Barring special circumstances, the nisi prius court must consider each motion separately, drawing inferences against each movant in turn.'" *Blackie v. State of Maine*, 75 F.3d 716, 721 (1st Cir. 1996) (quoting *EEOC v. Steamship Clerks Union, Local 1066*, 48 F.3d 594, 603 n.8 (1st Cir. 1995)). The same standard of review applies: "with cross-motions for summary judgment, [the Court] 'must view each motion, separately,' in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." *OneBeacon Am. Ins. Co. v. Commercial Union Assur. Co. of Canada*, 684 F.3d 237, 241 (1st Cir. 2012) (quoting *Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 40 (1st Cir. 2010)).

## IV.    DISCUSSION

### A.    THE WASSERMANS' MOTION FOR SUMMARY JUDGMENT

In their Motion for Summary Judgment, the Wassermans assert that Wells Fargo lacks standing to enforce the Loan Agreement and that the Loan Agreement is illusory with respect to non-recourse liability. (ECF No. 70-1 at 1, 2.) Wells Fargo's response avers proper standing and denies the contract is illusory in any respect. (ECF No. 76 at 8.) From the formation of and exchange of documents surrounding the Trust, it is apparent that Wells Fargo, as successor trustee, has standing to enforce the Loan Agreement. (ECF No. 76 at 3.) However, there are genuine issues of material fact as to whether the contract is illusory because the scale of the recourse carve-outs may swallow the Loan's purported non-recourse nature.

### i.    Standing to Enforce the Contract

The Wassermans' main contention regarding Wells Fargo's standing to enforce the Loan Agreement stems from the purported differences between the First Assignment of the Loan from BOA to LaSalle and the Second Assignment of the Loan from LaSalle to Wells Fargo.  (ECF No. 70-1 at 3.)   Specifically, the Wassermans state that the Second Assignment "assigns LaSalle's interest in the collateral [the Property], but . . . unlike the prior assignment to LaSalle, does not include the same documents or other rights." *Id.*   To support this argument, the Wassermans rely primarily on the language of each Assignment. *Id.* at 3-8.

Where the First Assignment refers to "all right, title and interest of [BOA] in and to . . . all of the documents and/or instruments in the possession of [BOA] pertaining to the loan evidenced by the Note described," the Second Assignment refers to "all of [LaSalle's] right, title and interest . . . in and to the following:  Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing." *Id.* at 4-5. The Wassermans assert that the Second Assignment omits any reference to "the Promissory Note" and the "Security Instrument" and includes an erroneous reference to documents memorializing the First Assignment;[6] therefore, the Wassermans argue, these omissions and errors render the Second Assignment less inclusive than the First such that rights under the Loan Agreement are not included. *Id.* at 6. More specifically, the Wassermans claim the Second Assignment transfers only rights to "the documents evidencing the 'hard collateral,' but not those contained in the Loan Agreement." *Id.* at 6-7.

---

[6] The Defendants' Motion for Summary Judgment states that "the two assignments are radically —and materially—different."  (ECF No. 70-1 at 5.)   However, the Court notes that the Defendants' argument as to this point seems to center on certain references to the Loan Agreement in the First Assignment not present in the Second. Therefore, the Court will focus its analysis on these references.

Wells Fargo responds that the PSA and the Instrument of Appointment, rather than the Second Assignment, reflect a transfer of rights that grants Wells Fargo standing to pursue this action. (ECF No. 76 at 9-10.) The PSA that created the Trust refers to the necessity of a written instrument of acceptance of appointment by the successor trustee in order for the resignation or removal of the predecessor trustee to become effective. (ECF No. 61-1 at 5.) Wells Fargo executed this instrument, the Instrument of Acceptance, and in doing so, as the PSA states, became "fully vested with all the rights, powers, duties and obligations of its predecessor [trustee]." *Id.* Thus, the question is whether Wells Fargo's "rights, powers, duties and obligations" include the power to enforce the Loan Agreement despite differences between the language in the First Assignment and Second Assignment.

The Court finds the answer to this question in the PSA, which specifically notes that the successor trustee, "*without any further act, deed or conveyance,*" takes on all rights of the predecessor trustee. *Id.* (emphasis added). The predecessor trustee's rights stem from the Trust, the "undisputed holder of the subject loan,"[7] meaning that Wells Fargo's power to enforce the Loan Agreement follows from the Trust's standing. (ECF No. 76 at 9.) *See U.S. Bank, N.A. v. Squadron VCD, LLC*, No. 10-CV-5484, 2011 WL 4582484 (S.D.N.Y. Oct. 3, 2011) (holding that a similarly situated predecessor trustee had standing to enforce a loan agreement where trust had undisputed standing formed under a pooling and servicing agreement, and transfer from predecessor trustee was a valid instrument of appointment).

The Court therefore concludes that the Trust's acknowledged standing and the clear transfer of rights from the predecessor trustee (LaSalle) to the successor trustee (Wells Fargo) via the PSA and the Instrument of Appointment demonstrates as a matter of law that Wells Fargo

---

[7] Indeed, the Wassermans do not raise any issues with respect to the Trust's status as the holder of the loan throughout their filings in this matter. (ECF No. 70-1 at 3-8; ECF No. 76 at 9.)

has standing to bring this action.  Defendants' Motion for Summary Judgment on this issue is DENIED.

### ii.    Illusory Nature of the Contract

The Wassermans also contend that the Loan Agreement is not enforceable as a matter of law because it is an illusory contract, that is, the purported "non-recourse" nature of the loan is "undermine[d]" by the number and nature of the recourse carve-out provisions in Section 15(c). (ECF No. 70-1 at 9.)  The Court however finds that there are genuine issues of material fact on this issue and therefore their motion must fail.  The borrower, WREC, bargained for a generally non-recourse Loan Agreement, but that Loan Agreement may not have imposed any mutuality of obligation on Wells Fargo as it was apparently impossible for WREC to default on the loan without incurring full recourse liability, allowing Wells Fargo to arbitrarily decide the extent of WREC's and the individual's liability.

The Wassermans assert that the contract is illusory as to non-recourse liability:  although "[t]he Loan Agreement here is structured as non-recourse to both the borrower's unpledged assets and the borrower's principals in Section 15.1(a), subject to certain exceptions in Sections 15.1(b) and 15.1(c)," the exceptions are so broad that "any default may trigger the imposition of full recourse liability."  (ECF No. 70-1 at 9, 11.)  To support this assertion, the Wassermans direct the Court to compare the covenants of Article 6 and 7 in the Loan Agreement (breaches of these covenants trigger full recourse liability) with the "Events of Default" in Section 11.1 (do not trigger full recourse liability).  (ECF No. 70-1 at 12-15.)  In comparing these provisions, the Wassermans conclude that "there can be no conceivable situation where the business fails and the [Borrower Principals] are not liable."  *Id.* at 17.  "It is settled law that, when the promised act is conditional on the occurrence of a future event within the control of the promisor, the promise

9

is illusory." (ECF No. 70-1 at 16) (quoting *Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 8 (1st Cir. 1994)). Here, if Wells Fargo could arbitrarily decide whether to limit recovery to nonrecourse liability by determining that the default violated Section 11.1 or Section 6, then the promise was illusory.

Wells Fargo responds the contract was not illusory at all because Wells Fargo did not have the power to arbitrarily decide that any monetary default would trigger full-recourse liability.

"Contract formation . . . requires mutuality of obligation, which is achieved 'when both parties are legally bound through the making of reciprocal promises.'" *D'Oliveira v. Rare Hospitality Int'l, Inc.*, 840 A.2d 538, 540 (R.I. 2004) (citation omitted) (quoting *Centerville Builders, Inc. v. Wynne*, 683 A.2d 1340, 1341 (R.I. 1996)). This mutuality of obligation is destroyed where one of the promises exchanged is illusory, but "'[t]hat the condition applicable to one party is lighter than the condition applicable to the other does not render the favored party's promise illusory.'" *Holliston Mills, Inc. v. Citizens Trust Co.*, 604 A.2d 331, 336 (R.I. 1992) (quoting *Lehner v. Adam Hat Stores, Inc.*, 143 A.2d 313, 317 (R.I. 1958)).

In *Crellin*, the First Circuit stated that "[i]t is settled law that, when the promised act is conditional on the occurrence of a future event within the control of the promisor, the promise is illusory." 18 F.3d at 8 (citing *Vickers Antone v. Vickers*, 610 A.2d 120, 123 (R.I. 1992)). The parties in *Crellin*, for instance, both believed that their contractual obligations with respect to a financial transaction were contingent upon the receipt of funding or approval from third parties. *Id.* However, there were no duties imposed upon the parties with respect to obtaining that financing; in fact, the *Crellin* court described the obtainment of approval by the plaintiff as within the "unbridled discretion" of that party. *Id.*

At this stage of the litigation, viewing the facts in the light most favorable to non-movant Wells Fargo, the Court cannot determine whether the Loan Agreement is illusory as a matter of law because the contract's language could be read in a number of different ways.  For example, the contract could be read such that Wells Fargo did not have, as a matter of law, "unbridled discretion" to collect the full value of the loan no matter the circumstances of the Wassermans' default.

Another example, Wells Fargo notes, is that if the value of the collateral exceeded the value of the loan, a monetary default would not trigger full recourse liability.  (ECF No. 76 at 12.)  In this scenario, Wells Fargo would not have the option of demanding the full value of the loan from the Wassermans, such that Wells Fargo would not be permitted to decide arbitrarily to change the amount of liability, and its promise to not seek full recourse liability would not be illusory.  *Id.*

The Court notes that one of the Wassermans' attempts to align a Section 11 "Event of Default" with an Article 6 covenant fails.  The Wassermans state that Section 11.1(a), providing that a failure to make periodic loan payments on time is an "Event of Default" but "presumably one not triggering full recourse liability," mirrors Section 6.1(a)(xviii) in that it "requires consistent solvency and current payment of all liabilities."  (ECF No. 70-1 at 12.)  However, Section 6.1(a)(xviii) actually refers to the borrower's "fail[ure] to remain solvent or pay its own liabilities . . . *only from its own funds*."  (ECF No. 59-6 at 5) (emphasis added).  The language ignored by the Wassermans could allow Wells Fargo to decide arbitrarily that WREC's failure to make current payment of all liabilities would require the imposition of full recourse liability.  However, there is an equally plausible interpretation: that a failure to pay WREC liabilities specifically using WREC funds is a violation of Section 6 that would require the imposition of

11

full recourse liability but that a failure to pay WREC liabilities generally is an "Event of Default" *not* necessarily triggering full recourse liability. (ECF No. 59-6 at 5, 38; ECF No. 70-1 at 13.)

Because the Court cannot conclude as a matter of law that the contract is or is not illusory, Defendants' Motion for Summary Judgment (ECF No. 70) is DENIED.

### B.    WELLS FARGO'S MOTION FOR SUMMARY JUDGMENT

In its Motion for Summary Judgment, Wells Fargo asserts that the "undisputed breaches of the loan agreement render [the Wassermans] personally liable for all amounts due on the subject loan." (ECF No. 56-1 at 16.) In their response, the Wassermans dispute the existence of a breach and Wells Fargo's characterizations of WREC's financial transactions. (ECF No. 74-1 at 5-16.) They further assert that even if there was a breach, Richard and David are not personally liable for the amount of the Loan. *Id.*

In light of the genuine issue of material fact as to whether the contract is enforceable or illusory, the Court will not address the potential breaches of the Loan Agreement at this time and will restrict its discussion of Defendants' personal liability for the loan to Defendants' Motion for Partial Summary Judgment. Because it is not clear whether the Loan Agreement is enforceable such that any breach would be actionable, and because it is not clear as a matter of law whether Richard and David are personally liable for the full value of the Loan, Plaintiff's Motion for Summary Judgment (ECF No. 56) is DENIED.

## C.   DAVID AND RICHARD'S MOTION FOR PARTIAL SUMMARY JUDGMENT

In their Motion for Partial Summary Judgment (ECF No. 72), David and Richard "assert that they are not liable as borrower principals under the terms of the [ ] Loan Agreement . . . because neither David nor Richard are or have ever been principals of WREC, the Borrower under the loan." (ECF No. 72-1 at 1.)  In light of this "mistake" or "ambiguity" identifying David and Richard as Borrower Principals, the two Wassermans ask that the Court either reform the contract or find David and Richard not personally liable as a matter of law. *Id.* at 5-11.  In response, Wells Fargo argues that the loan unambiguously defines "Borrower Principal" as "individually and collectively . . . David D. Wasserman, an individual, and Richard N. Wasserman, an individual." (ECF No. 77 at 8.)  As explained below, because they have not demonstrated entitlement to summary judgment, David and Richard's Motion for Partial Summary Judgment (ECF No. 72) must be DENIED.

David and Richard rely on the Organizational Chart's identification of David and Richard only as owners of DDW and RNW, respectively, rather than as Borrower Principals and individuals, as they are identified by their signatures in the Loan Agreement, as evidence supporting their argument. (ECF No. 72-1 at 2.)  They contend that the Organizational Chart's failure to use the term Borrower Principals means that their designation as Borrower Principals throughout the Loan Agreement was a mistake or a scrivener's error and therefore they are not personally liable. *Id.* at 2, 5.

Scrivener's errors have not received much attention recently in Rhode Island courts. *Emhart Industries, Inc. v. Home Ins. Co.*, 515 F.Supp.2d 228, 247 (D.R.I. 2007).  However, one Rhode Island court recently agreed with other jurisdictions that scrivener's errors "are treated as a mutual mistake because the error resulted in the writing not properly reflecting the intent of

each party." *St. Michael's Country Day School v. Berluti*, No. 08-0012, 2012 WL 1889235 (R.I. Super. May 16, 2012).[8]   The Rhode Island Supreme Court "has defined mutual mistake as one that is common to both parties wherein each labors under a misconception respecting the same terms of the written agreement sought to be [reformed]."   *Merrimack Mut. Fire Ins. Co. v. Dufault*, 958 A.2d 620, 624 (R.I. 2008) (internal quotation marks and citations omitted).   The party asserting a mutual mistake has the "the burden of proving by clear and convincing evidence that there was a mutual mistake of fact."   *Hazard v. Hazard*, 45 A.3d 545, 551 (R.I. 2012).

Here, David and Richard have not met their burden to show, by clear and convincing evidence, a mistake common to both parties.   While not appearing in the Organizational Chart, the term "Borrower Principal" is defined in the Loan Agreement and appears therein numerous times.   (*Eg.*, ECF No. 59-5 at 10; ECF No. 59-7 at 8, 10, 21.)   These numerous references to David and Richard as Borrower Principals and as individuals appear to indicate that Wells Fargo intended for David and Richard to be personally liable.   Although David and Richard claim that the loan documentation "incorrectly names each of them as a 'Borrower Principal," their assertions that they did not intend to make themselves personally liable are not sufficient to establish a mutual mistake. (ECF No. 72-1 at 2.)   Nor is their assertion that the Organizational

---

[8]   This concept of a scrivener's error as type of or the basis for mutual mistake is fairly consistent in case law across jurisdictions. For instance, in *Cross v. Bragg*, the Fourth Circuit "recognized that 'a scrivener's error, like a mutual mistake, occurs when the intention of the parties is identical at the time of the transaction but the written agreement does not express that intention because of that error . . . .'" 329 F.App'x 443, 454 (4th Cir. 2009) (quoting *Blackshear v. Reliance Standard Life Ins. Co.*, 509 F.3d 634, 642 (4th Cir. 2007)). *See also Nash Finch Co. v. Rubloff Hastings, LLC*, 341 F.3d 846 (8th Cir. 2003); *GET, LLC v. City of Blackwell*, 407 F. App'x 307 (10th Cir. 2011); *Providence Square Ass'n, Inc. v. Biancardi*, 507 So. 2d 1366 (Fla. 1987); *Amin v. Guruom, Inc.*, 635 S.E.2d 105 (Ga. 2006); *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303 (Minn. 2003); *Johnson v. Dist. VII*, 204 P.3d 714 (Mont. 2009); *Key Design Inc. v. Moser*, 983 P.2d 653 (Wash. 1999) *am. sub nom. Key Design, Inc. v. Moser*, 993 P.2d 900 (Wash. 1999).

Chart stands as "constructive notice" of a scrivener's error because the Organizational Chart does not contain the term "Borrower Principal" sufficient to establish a mutual mistake. *Id.* A unilateral mistake by David and Richard, that they "missed the distinction" when signing the Loan Agreement as "an Individual," does not, as a matter of law, permit reformation of the contract, nor does it automatically absolve the two Wassermans of liability. (ECF No. 72-1).

Furthermore, David and Richard's attempts to circumnavigate the mutual mistake requirement fail. Their conclusion that the Organizational Chart provides constructive notice of a "scrivener's error" is questionable because the Organizational Chart does not contain the term "Borrower Principal." (ECF No. 59-7 at 24; ECF No. 72-1 at 2.) Under the applicable standard, the Court cannot infer from the Organizational Chart's failure to use the term Borrower Principal that all the other references in the Loan Agreement to David and Richard as Borrower Principals are scrivener's errors. In addition, David and Richard's purported reliance on *Emhart*, 515 F. Supp. 2d at 247-48, for the proposition that evidence that "mutuality of mistake" may not be necessary if the scrivener's error is a clerical mistake is of no avail. (ECF No. 72-1 at 8.) Here, there is no evidence of a clerical mistake. Moreover, under Rhode Island law, "[f]or a contract to be subject to judicial reformation, the court must first find a mutual mistake." *Gorman v. Gorman*, 883 A.2d 732, 740 (R.I. 2005). Consequently, David and Richard have not convinced the Court find that there was a mistake in the Loan Agreement such that David and Richard are not personally liable as a matter of law.

In the alternative, David and Richard assert that there is ambiguity in the contract because the Organizational Chart and the Loan Agreement appear to characterize the two Wassermans' roles in the transaction differently — as individuals versus as signors on behalf of DDW and RNW, respectively. (ECF No. 72-1 at 9-10.) The Court agrees that David and Richard's

personal liability turns on an ambiguity because their identification as "Borrower Principals" is elsewhere controverted by references to "Borrower Principal" appearing to apply only to an organizational entity. It remains unclear, however, whether there was adequate consideration on the part of David or Richard to be personally liable rather than their companies, RNW and DDW. Furthermore, Wells Fargo's claim that the Wassermans are personally liable for the full amount of the subject loan as a matter of law goes too far. Due to the ambiguity in the contract and the unresolved question of personal liability, summary judgment cannot enter.

Under Rhode Island law, "[w]hether a particular contract is or is not ambiguous is a question of law." *Young v. Warwick Rollermagic Skating Ctr., Inc.*, 973 A.2d 553, 558 (R.I. 2009) (quoting *Gorman*, 883 A.2d at 738 n.8). "In determining whether or not a particular contract is ambiguous, the court should read the contract 'in its entirety, giving words their plain, ordinary, and usual meaning.'" *Id.* (quoting *Mallane v. Holyoke Mut. Ins. Co. in Salem*, 658 A.2d 18, 20 (R.I. 1995)). "And, while carrying out this task, the court should 'refrain from engaging in mental gymnastics or from stretching the imagination to read ambiguity . . . where none is present.'" *Id.* at 559. "Contract ambiguity arises 'only when [a contract] is reasonably and clearly susceptible of more than one interpretation.'" *Haviland v. Simmons*, 45 A.3d 1246, 1258 (R.I. 2012) (quoting *Rotelli v. Catanzaro*, 686 A.2d 91, 94 (R.I. 1996)). "An ambiguity in a contract cannot be resolved on summary judgment." *Rotelli*, 686 A.2d at 95.

Here, the ambiguity arises because of the identification of both David and Richard as Borrower Principals in the Loan Agreement (ECF No. 59-5 at 10; ECF No. 59-7 at 12, 21) despite several references within the Loan Agreement and its exhibits to the Borrower Principal as an organization or other corporate entity, not individuals. (ECF No. 59-5 at 23, 34, 36; ECF No. 59-6 at 8, 38, 39; ECF No. 59-7 at 24.) These other references to the Borrower Principal as

an organization or other corporate entity within the Loan Agreement are nonsensical given the definition of Borrower Principal within the same document as an aggregate of individuals: "'Borrower Principal' shall mean if more than one, individually and collectively, as the context may require, Bernard Wasserman, an individual, David D. Wasserman, an individual, and Richard N. Wasserman, an individual." (ECF No. 59-5 at 10.)

For example, Article 4 starts out ". . . each Borrower Principal represents and warrants to Lender as of the Closing Date that ... each Borrower Principal (when not an individual) (a) has been duly organized and is validly existing and in good standing with requisite power and authority to own its properties and to transact the businesses in which it is now engaged." (ECF No. 59-5 at 23.)  This clause does not make sense if it refers to the Wassermans as a group of individuals; it may instead refer to an entity such as DDW or RNW, both the purported Borrower Principals in the Organizational Chart attached to the Loan Agreement.  (ECF No. 59-7 at 24.) Here, the term "Borrower Principal" is reasonably susceptible to more than one interpretation:  it may mean Bernard, David, and Richard Wasserman as individuals or collectively, as it purports to in the "Definition" section; or it may mean DDW or RNW, as suggested by language in the Loan Agreement and the Organizational Chart.   Since the Court finds there is a relevant ambiguity in the language of the Loan Agreement on this issue, summary judgment cannot enter.

Turning to the necessity of consideration by David and Richard, Wells Fargo argues that a personal guaranty by a corporate officer has adequate consideration without any benefit accruing to the officer personally, so long as "the corporation receives the consideration."  (ECF No. 56-1 at 22) (quoting *Katz v. Prete*, 459 A.2d 81, 86 (R.I. 1983) ("[w]hen a corporate officer agrees to be liable for a debt of the corporation, it is not necessary for consideration to move to the officer personally. It is enough if the corporation receives the consideration."). *See also CIC-*

*Newport Assocs., LP v. Jung Kang Lee*, No. 10-0648, 2010 R.I. Super. LEXIS 184, *23-25 (Dec. 16, 2010) (where a corporation's vice president signed a personal guaranty for a lease agreement, the benefit accrued to the corporation was adequate consideration for the personal guaranty). Wells Fargo adds that the Wassermans, as "beneficial owners" of WREC, received "substantial consideration by way of $21,500,00 in loan proceeds." (ECF No. 77 at 11.) Thus, Wells Fargo concludes that David and Richard's alleged personal guaranties are supported by sufficient consideration to be enforceable. *Id.*

However, with respect to the case law, David and Richard were undisputedly not corporate officers of WREC, but rather indirect owners of WREC via their ownership interests in DDW and RNW, respectively. (ECF No. 59-7 at 24.) Wells Fargo cites no law to support its proposition that the indirect, "beneficial" ownership of WREC is sufficient consideration for personal liability. (ECF No. 77 at 11.) Therefore, because it is not clear that David and Richard's "personal guaranty" was supported by sufficient consideration to be enforceable, the Court cannot grant summary judgment as to David and Richard's personal liability for the Loan.

Because the term "Borrower Principal" is ambiguous and the Court cannot conclude as a matter of law whether David and Richard are personally liable for the Loan Agreement, David and Richard's Motion for Partial Summary Judgment (ECF. No 72) is DENIED.

18

## V.   CONCLUSION

For the foregoing reasons, the Court DENIES the following three motions:  (1) Plaintiff's Motion for Summary Judgment (ECF No. 56); (2) Defendants' Motion for Summary Judgment (ECF No. 70); and (3) Defendants' Motion for Partial Summary Judgment.  (ECF No. 72.)

IT IS SO ORDERED.

John J. McConnell, Jr.
United States District Judge

September 28, 2012